

1  Cameron Mathew Rose
   75 Lucky Lane
2  Reno, NV, 89502
   Phone N/A
3  Email: jesusmarijuana@yahoo.com

4               UNITED STATES DISTRICT COURT

5                    DISTRICT OF NEVADA

6  CAMERON MATHEW ROSE,                    Case No.: 3:19-cv-00166-MMD-WGC

7           Plaintiff,

8  vs.                                     AMENDED COMPLAINT AND
                                           PLAINTIFFS OBJECTIONS TO
9  THE CITY OF RENO, et al.,               MAGISTRATE JUDGES REPORT
                                           AND RECOMMENDATIONS
10          Defendant

11

12

13                          **BACKGROUND**

14  In a 2009 report done by The U.S. Department of Housing and Urban Development's (HUD), Office of Community
    Planning and Development, found that nearly four in ten sheltered (Homeless*) adults (37.8 percent) has a
15  disability, compared to 26.2 percent of the poverty and 15.5 percent of the total U.S. population. Thus, a homeless
    adult is nearly 2.5 times more likely to have a disability than an adult in the U.S. population.[1] Given this information
16  we can see that in order to truly protect those with disabilities, the homeless are where most cases for protections
    should arise, as this is where most people with disabilities currently exist with a 22.3% differential of people who
17  are homeless having a disability compared to the rest of the population.

18  On a single night in January 2009, the states with the highest concentrations of homeless people were Nevada,
    where .85 percent of the total population was homeless, followed by Oregon, Hawaii, California, and Washington.[2]
19  Thus not only are homeless more likely to be disabled then the average population but Nevada is amongst the
    highest concentrated areas for homeless. While the initial years presented are a decade old it shows a pattern, as this
20  continues today, with Nevada around the number 3 spot currently.

21  On a single night in January 2018 nearly one-quarter of individuals experiencing homelessness had chronic patterns
    of homelessness (88,640 homeless individuals or 24%). Nearly two in three chronically homeless individuals were
22  staying in unsheltered locations such as under bridges, in cars, or in abandoned buildings (65% or 57,886 people).
    This was much higher than the 48 percent unsheltered rate for all people experiencing homelessness as individuals.[3]

23

24                    _____

25

26  * Plaintiffs clarification
27  [1] Pg 25 of The 2009 Annual Homeless Assessment Report to Congress by HUD.
    [2] Pg ii of The 2009 Annual Homeless Assessment Report to Congress by HUD.
28  [3] Pg 64 of The 2018 Annual Homeless Assessment Report to Congress by HUD.
    AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND
    RECOMMENDATIONS - 1

As per 24 CFR (statute symbol) 578.3 defines Chronically homeless as:

**(1)** *"A "homeless individual with a disability," as defined in section 401(9) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11360(9)), who:*
**(i)** *Lives in a place not meant for human habitation, a safe haven, or in an emergency shelter; and*
**(ii)** *Has been homeless and living as described in paragraph (1)(i) of this definition continuously for at least 12 months or on at least 4 separate occasions in the last 3 years, as long as the combined occasions equal at least 12 months and each break in homelessness separating the occasions included at least 7 consecutive nights of not living as described in paragraph (1)(i)..."*

While at this current time the specific classification of being homeless, or more specifically chronically homeless, has not been designated as a "specially protected interest group", the classification of being discriminated against based on one's disabilities, has been well established with such laws as the Americans with Disabilities Act (ADA). Thus the Plaintiff is primarily questioning that should a private entity use a government agency to discriminate upon a person based primarily on an individual's chronic homelessness, has the government agency permitted a private entity to discriminate against an individual over their disabilities by correlation, and should it be in fact proven that their status as being homeless/chronically homeless was the cause for infringement of rights and, not actual conduct, that this would show discrimination based on an individual's disabilities? Given that, a person's chronic homelessness is tied to their disability and that in order to be defined as chronically homeless one must first have a disability, the Plaintiff argues that it absolutely would.

The Plaintiff notes that this specific perspective of argument has never been argued in any court and thus is likely to be an argument of first impression, unless there is a similar claim the Plaintiff is unaware of. Due to these circumstances the Plaintiff will elaborate to show through legal statutes and common law principles relevant that the Plaintiff has been discriminated against due to his disabilities and that The City of Reno, the Reno Police Department, the Cal-Neva, and the Silver Legacy/Eldorado are liable for their actions.
To begin the Plaintiff suffers from several mental illnesses, to which over the majority of the past two decades, the Plaintiff has received a Social Security Disability Income for his associated illnesses. These include amongst others Bipolar disorder having both depressive and manic aspects, Attention Deficit Hyperactive Disorder (ADHD), Post Traumatic Stress Disorder (PTSD), and Insomnia, just to name a few of the relevant disorders the Plaintiff has and will discuss due to the violations. The Plaintiff has suffered with these ailments for the majority part of his life.

The Plaintiff has been awarded an allotment from the Social Security Administration, due to the Plaintiffs inability to maintain employment, pertaining to his disabilities, which have attributed to the Plaintiff's chronic homelessness. Examples include, but are not limited to; an inability to wake up to alarm clocks due to the Plaintiff's insomnia. This not only pertains to being awoken by an alarm clock but passing back out for several hours without realizing. Additionally, the Plaintiffs insomnia causes days where the Plaintiff is unable to sleep, sometimes going days without sleep. The Plaintiffs manic episodes have created extensive difficulties for the Plaintiff in his ability to interact and communicate with others. How does one maintain employment when your boss thinks you're yelling at them when trying to communicate a different idea or expressing oneself? How do you keep friends? The Plaintiff could be discussing a topic of conversation, such as this, and at times it seems as if the Plaintiff is riled up to the point the Plaintiff has to be constantly requested to calm down. The Plaintiff's PTSD is triggered during times when the Plaintiff deals with people exerting authority over the Plaintiff. This has come about due to circumstances as a child where adults with authority over the Plaintiff would abuse their authority by assaulting the Plaintiff and injecting him with drugs (Thorazine) due to the Plaintiffs noncompliance or voicing of grievance rather than because the Plaintiff had become a danger to himself or others. Often times the Plaintiff seems agitated and combative due to the anxiety and instant manic episode that ensues. This often times makes encounters with law enforcement and private securities difficult. Generally, the times when these individuals don't have the "whatever I say goes" attitude, which usually includes some contemptuous behaviors that treat the Plaintiff as if he is already a criminal, are when the Plaintiff doesn't have what turns into escalated confrontations, as it often times seems as if the Plaintiff is yelling.

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 2

1
2
3
4
5

While the Plaintiff does struggle daily with the disabilities he has to cope with, the Plaintiff has been working over the years on getting better, under such circumstances. For example, the Plaintiff has been working on his interaction skills and volume control issues (associated with the Plaintiffs mania), by interacting with community members in environments where such behaviors wouldn't cause a disturbance to others, such as the Plaintiff had been doing with the Sports Book owned by William Hill located at the Cal-Neva prior to the first incident. The Plaintiff had been working on this at the Cal-Neva for almost 6 months prior, without one occasion, where the Plaintiff was trespassed of the property, due to the Plaintiff's behaviors, which includes that on most if not all occasions, the Plaintiff was in possession of the items that came into question. In fact, the Plaintiff had created an environment where he was respected not only for his skill as a handicapper, but also for his intelligence and poise, especially given the circumstances associated with his life.

6
7
8
9
10
11
12

As a result of the Plaintiffs disabilities, the inability for the Social Security Administration to take care of its acknowledged obligations, and constant interaction with law enforcement, which has resulted in multiple incarcerations for brief periods of time, the Plaintiff has spent most of his adult life, since he was 19, homeless, more then he has not. Prior to the initial incident on March 16[th,] 2017 the Plaintiff had been homeless since September of 2016. This accounts for 5-6 months of the required time frame needed to be defined as being chronically homeless. The Plaintiff had been indoors for approximately 8 months prior to that, where he had a residence in downtown Reno, starting in January of 2016. Prior to that the Plaintiff had been Homeless on the streets of Oakland since 2014. Thus the Plaintiff meets the standards set to be defined as chronically homeless when included with his disabilities. Since then the Plaintiff has remained homeless, getting off the streets where the Plaintiff couch surfed from February to June of 2018, and still remains under the standards of being defined as "chronically homeless." Although, at the time of this writing, the Plaintiffs circumstances have changed, where this should no longer be the case.

13
14
15
16

The Plaintiff had choosen to live under the definition of an unsheltered chronically homeless, as he finds the shelters to be intolerable, in the way shelter staff treat homeless like criminals due to their homelessness. They are very degrading with their holier than thou attitude, despite the fact that they make a living off federal grants provided to assist with homelessness, but which are not used that way. The thievery, sexual misconduct, and drug fueled environment, not only brought about by the homeless, but the employees of the shelter as well, is not the type of environment the Plaintiff feels comfortable living in. Nor does the shelter accommodate the Plaintiff's needs such as his insomnia that the Plaintiff would rather live on the streets and allow the space he would take up, be provided to someone else, who needs it and can't sustain on the streets.

17
18
19
20
21
22
23
24
25
26

 Given these circumstances, and that the Plaintiff does not have family or friends whom he can rely upon to watch his personal possessions, when the Plaintiff chooses or needs to enter a place of public accommodation, who has issues with the fact that the Plaintiff is forced to keep his limited property on him at all times to prevent loss, what is the Plaintiff supposed to do? Does a place of public accommodation have a right to exclude solely on the basis of a homeless persons' personal possessions should those possessions not cause a disturbance to the commerce and use of the property by other patrons or cause a direct threat? Wouldn't allowing such acts make it lawful to thus then exclude homeless from obtaining things needed to survive such as food, shelter in the innkeeper common law sense, facilities to relieve one self and other unalienable rights like an individual's right to pursue happiness and to be free from discrimination by enjoying the same benefits, equitable treatment, and access to facilities available to others? The Plaintiff does not feel that he really needs to elaborate on the courts about ones right to property, as this has been thoroughly established even before our country was established, considering the well-established long standing rights to life, liberty, and property. But, the Plaintiff will note that to hinge a citizen's right upon whether they possess certain unobjectionable items, i.e. a blanket, a backpack, a diaper bag or a medical assistance bag, or even several purses, is absolutely discriminative when these standards are not applied evenly as the 14th Amendment assures us with equal protections under the law as there was no legitimate business reason for the refusal of service. This discrimination is not focused on the conduct of the Plaintiff but rather the status of the Plaintiff and is unconstitutional.

27
28

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 3

1    It is for this reason the Plaintiff requests, the policy of "excessive baggage," to be challenged facially, under the 14th
2    Amendment, meaning are there any other instances where these items, or similar items, would be permitted and
      have been permitted, without disturbing the purpose of the property amounting to exclusion, which would indicate a
3    bias towards the homeless and those with disabilities because of their status on this or other occasions? The Plaintiff
      has already provided several examples in the paragraph above.

4     In addition, the Plaintiff would like to include a hypothetical example to emphasize his point. Should a Judge's
5    wife/husband decide to have lunch at Wingfield Park with their significant other, and then proceeds to one of the
      casinos, let's use Cal-Neva since it's where one incident occurred. Would this individual be excluded if they entered
6    the premises with a bag that had a blanket hanging from it? How does one even discern what excessive baggage is?
      How does one even possess excessive baggage in a hotel/casino?

7    While the Plaintiff does not object that it is a business's right to exclude for reasons that might seem discriminatory,
8    where a venue for example requires a dress code that the Plaintiff likely wouldn't be able to adhere to, the Plaintiff
      would argue that these are not places of public accommodations but places of private accommodations or private
9    clubs. (Statute symbol) 36.102 (e) *Exemptions and exclusions.* This part does not apply to any private club. A club
      would be defined as "*A voluntary, unincorporated association of persons for purposes of a social, literary, or*
10   *political nature, or the like. A club Is not a partnership. ... The word "club" has no very definite meaning. Clubs are*
      *formed for all sorts of purposes, and there is no uniformity in their constitutions and rules.*" The key focus here
11   being uniformity in rules and regulations as the distinct separation.

12   The relevant and more important issue that accommodates, is these venues obligations, to provide concise warnings
      posted in a conspicuous manner, providing the information to patrons of the regulations that are enforced regularly
13   and evenly, so as to avoid arbitrary enforcement, discrimination, and ignorance by the patron. These obligations
      were explicitly proclaimed by casino employee witnesses, when they testified at a municipal court trial, that no
14   warnings had been posted at the time.

15    A few examples would include how a large amount, if not all, of the casinos have it clearly posted on entry doors
      that motorcycle gang colors/patches are not permitted, how smoking in certain areas is not permitted, or how no
16   trespassing or employee only signs are used in non-permitted areas, are clearly posted. The Plaintiff even notes that
      establishments such as Rail City and for a period of time Gold Dust West, which their policy started around the time
17   of the Plaintiffs trial, have posted regulations like this, visibly. Although, the Plaintiff would like to discuss the
      Constitutionality of a private entity being able to search through a citizens' property without a warrant as Rail City
18   does to "search for weapons." Thus the enforced upon regulations seem to not be the regulations that are established
      but have only been used as justification to permit their discrimination.

19    The Plaintiff would even argue that this could be accommodated with a security guard or doorman to establish such
20   regulations. Yet little of this exists in this case and was clearly established during trial that this was not handled as
      part of their required obligations. While the Cal-Neva incident did have a security guard initially claim that "bed
21   roll's" were not permitted on property, when management came into play they permitted the Plaintiff to stay at the
      property with the property that was being objected, at which point the Plaintiffs right to remain on property hinged
22   upon "shutting down his disability as will be discussed later, prompting the question of the necessity to make issue
      at all and if it was a regulation. Not permitted, means not permitted, which is not permitted for reason, not bend the
23   rules to an individual's arbitrary desires, thus the Cal-Neva through its own acted upon admission, acknowledged
      that there was not an actual need to have the supposed regulation and that there was no real need for even the
24   confrontation. If it had been necessary it would have been not okay for that day, and the previous 6 months, not
      starting tomorrow, and pertaining only to the Plaintiff who could not bring his property as he was the only one this
25   was being made issue with.

26   As far as the Silver Legacy case goes, the Plaintiff is being expected to just do what he is told and accept what is
      obviously not an evenly enforced regulation as the narrow language of excessive baggage leaves extensive room for
27   arbitrary speculation. Assuredly a regulation such as "excessive baggage" nor a "blanket called bed roll," could not
      survive a vague and overbroad test, under the 14th Amendment, which should be applied.

28
     AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND
     RECOMMENDATIONS - 4

1    The Plaintiff had placed bets the night before the Silver Legacy incident with no issue. He entered the day of, first
2    the Eldorado, then proceeded to the Silver Legacy, having spent over an hour between the two establishments,
     before needing to use a bathroom, with no issues. Given these circumstances the Plaintiff again has to question the
3    validity of the claimed imposed regulation. Having been on the property for well over an hour on multiple
     occasions, with casino's advanced video technology (eyes in the sky), you would think if formatted items like
4    "excessive baggage" was policy, it would have already been addressed. Especially considering the Plaintiff had been
     near the immediate vicinity of the security floor desk.
5    Does a place of public accommodation just get to make up regulations whenever they want and those of the public
6    must abide without question? Surely not hence the reason for the obligations of posting rules and regulations. The
     defendant is absolutely positive that on most days one could still walk into the accused locations and find others in
7    possession of the claimed objectionable items. Furthers it has never even been claimed that it was a new policy that
     was just being implemented that day and the foreseeable future. Thus, biased enforcement of supposed regulation
8    have been permitted to include the homeless and those with disabilities, as enforcement of stated regulations are not
     uniformly enforced and applied to all. Thus discrimination should exist in this case as equal enforcement of the
9    claimed "regulations" along with clearly informing patrons of these "regulations" does not exist.
10   The Plaintiff would like to take a brief moment to further argue that, under the 14th Amendment Equal Protection
     Clause, the rights established for specially protected interest groups, as defined today, exist solely because they
11   already existed for the common man. Arguably wouldn't a wealthy predominant member of society, if refused
     service for no reason, other than "non-specially protected" discriminatory reasons be able to seek remedies? Can one
12   only be discriminated against if they qualify under a special interest group? Are we not still adding to this list having
     recently added stuff like sexual orientation and gender identity protections? Or can we as a society just start refusing
13   to feed the rich in our poverty driven establishments just because they are rich? Segregate them to their own side?
     Absolutely not. Is this where we go as a society from one segregation to the next? The Plaintiff notes that the
14   relevance of this assertion can be seen in Title III of the ADA (statute symbol) 36.201(c), *Claims of no disability, as
     a person with disabilities is not granted as reasonable modification that was denied to an individual without a
15   disability.*
16   Given that the Plaintiff has surely shown discrimination has or is likely to have occurred, it would seem the Plaintiff
     now needs to associate the discrimination he experienced to the ADA standards. The City of Reno and the Casinos
17   may have claimed that the catalyst for the confrontation that ensued, where the Plaintiff was demanded to leave, was
     associated to the Plaintiff being in possession of the claimed prohibited items of a "bed roll" and " excessive
18   baggage," but in the end the real focus of attention, that was presented at trial and focused upon, was the Plaintiff's
     manic disorder associated with his Bipolar disorder and PTSD associated with the Plaintiffs psychomotor agitation,
19   with the scripted testimony provided by state witnesses predicated upon the fact that the Plaintiff had acted
     "belligerent, aggressive, and loud." In fact, over three incidences, 4 witnesses stated that this occurred without any
20   supportive examples provided to collaborate their claim except that plaintiff had protested that they were violating
     his constitutional rights.
21   To begin, Title III of the ADA (statute) 36.101(b) outlines broad coverage:
22   (b) *Broad coverage. The primary purpose of the ADA Amendments Act is to make it easier for people with
     disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a
23   broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in
     favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of
24   attention in cases brought under the ADA should be whether entities covered under the ADA have complied with
     their obligations and whether discrimination has occurred, not whether the individual meets the definition of
25   "disability." The question of whether an individual meets the definition of "disability" under this part should not
     demand extensive analysis.*
26   With, the law provided by the ADA, several significant aspects are associated with this statute. For example, the
     Plaintiff would like to highlight first the fact that attributing discrimination upon chronic homelessness to correlating
27   as discriminating upon one with disabilities and their disabilities can be made through this statute. The provision of
     "expansive coverage" would encompass being defined as chronically homeless, as one must have a disability, which
28   AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND
     RECOMMENDATIONS - 5

is the main argument presented by the Plaintiff in both the original and this Amended Complaint/Objections to the Magistrates Judge's Report and Recommendation. The fact that this has never been established prior, because it's never been addressed in this way, should not preclude the claims from proceeding through the court process. In fact, given that this correlation could have merit, it should be allowed to proceed to address whether or not this unaddressed perspective does indeed have merit and not just might.

Title III also makes mention to the fact that the primary objective is whether entities under the ADA complied with their obligations, which in this case they did not post adequate notice to inform patrons of enforced regulations, if they truly existed, nor are they enforcing supposed regulations evenly amongst all patrons, as discussed earlier to establish discrimination, and also whether discrimination has occurred. The definition of discrimination through Black's Law Dictionary is "*The act of denying rights, benefits, justice, equitable treatment, or access to facilities available to all others, to an individual or group of people because of their race, age, gender, handicap or other defining characteristic.*"
Further, Title III denotes to us that the previous 2 questions are even more important than whether the Plaintiff meets the definition of "disability." It even emphasizes upon this repeatedly throughout Title III stating explicitly that the question of whether a person meets the definition of "disability" under this part should not demand extensive analysis. Despite these favorable provisions associated with Title III, the Plaintiff has no qualms with providing, as the Plaintiff has done so far, clarity to the courts on exactly what the Plaintiff is accusing the government and these private entities of doing and how they acted jointly to violate the Plaintiff's rights through discrimination through the Plaintiff's disabilities.

The Plaintiff is proclaiming that while the initial justification for requesting the Plaintiff to leave surrounded upon a "bed roll" and "excessive baggage" these are just simple answers that were used to provide cause for the intrusion, but when push comes to shove, the City of Reno and the witness, did not present this at trial as the actual reason for exclusion. Throughout the trial it is reiterated time and time again that it was the Plaintiff's "belligerent, aggressive, and loud behavior," which occurred after the Plaintiff had already been requested to leave, for arbitrary discriminative reason, that caused his exclusion specifically. This was the highlighted theme presented by the City of Reno when, on behalf of the accused private entities, prosecuted the Plaintiff under 8.10.010 trespassing.
The Plaintiff is claiming that through unnecessary provocation over a non-regulation, upon becoming cornered over the intrusion, it is specifically the Plaintiff's Manic disorder and PTSD that was exploited and presented before the courts as to why the Plaintiff was trespassed, as if justified. Is it okay for anyone, especially a place of public accommodation, to antagonize an issue over nothing, but then use the adverse reaction to the unlawful intrusion to rationalize why they used a government agency to enforce an unlawful exclusion? Wouldn't this be exploiting the Plaintiff's disabilities, if the disability, is related to behaviors that could be misperceived as being "belligerent or aggressive or loud" acts, since this what was used to exclude the Plaintiff?

When Kathy Howard demands that the Plaintiff "shut his mouth" and hinges his right to inclusion upon this, she has not only violated the Plaintiffs right to speech and expression, but equivalently Kathy Howard was demanding that the Plaintiff just stop having a manic episode or leave, as noted he had just prior to this point been allowed permission to remain on property with the property at issue.

And thus by connection, Kathy Howard had told the Plaintiff, to just stop having his disability and hinged his right to access upon turning it off. This is not how manic works. The Plaintiff isn't able to just flip a switch and stop while an escalated event persists and meet others expectations. The pressure to keep talking is a component associated with manic as will be identified later. The Plaintiff's manic episode resulted from their intrusion. They caused it and then can just tell the Plaintiff to stop it and if he doesn't he is permissible exhibiting conduct that would permit a right to exclude?

Could the Plaintiff have relaxed and maintained without causing a scene? Absolutely, as this is what the Plaintiff did do, but the Plaintiff can't relax while others continue to force their decisions on the Plaintiff, making unreasonable demands, and just "shut his mouth." On some occasions the Plaintiff will continue to rant out the situations for hours, even days after, so as to understand what happened and who is really wrong. But this doesn't make nor mean that the Plaintiff was or would continue to disturb the lawful operations and the quiet enjoyment of the property by other patrons. This wasn't occurring due to the Plaintiff's behaviors but the unnecessary actions taken by employees

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 6

1 | of the places of public accommodation.

2 | As examples, twice the Plaintiff was left alone by Cal-Neva employees with no further continuation of issues
3 | because he was left alone to brood about the situation. The Plaintiff was focused on maintaining because he was not
trying to blow up where he spent most of his time, the location he had established a respectable and rewarding
4 | reputation, but any further attempted enforcement of the issues brought up with the Plaintiffs property would have
amounted to a permanent exclusion anyways. The Plaintiff was only trying to conclude the disagreement in a way
5 | that was amicable for both parties by bringing up the potential legal ramifications due to the harassment and
constitutional violations. But they didn't care. In fact, Kathy Howard at one point snidely remarked to the Plaintiff,
6 | and Michael Herrick even declared at trial, that they do not have to follow the Constitution!

7 | The first instance, the Plaintiff was able to control his manic, occurred when the manager arrived and they "did an
information check." The second time was once officers were determined they were going to be called. On both
8 | occasions the Plaintiff was left alone without additional issues. How many people patiently wait for officers, in this
case an officer, and provide themselves for arrest, without resistance, while acting belligerent, aggressive, and loud?
9 | No, the Plaintiff was non-compliant in a fashion similar to civil disobedience, well within his rights, while having a
manic episode, where he tried to stand up for himself and his rights, to which he was ignored. In the end,
10 | discrimination was instead enforced, in a Kangaroo Court, as "whatever they say goes," which is in no way the law.
With the Silver Legacy case, the Plaintiff points to how, when asked from a scale of 1-5 how loud the Plaintiff was,
11 | initially Michael Blanco proclaimed 3. Average would be 3. He noted at trial that the Plaintiff later progressed to a
4, but this is after the Plaintiff had been taken into a private room and handcuffed to enforce an unlawful exclusion.
12 | Despite this Michael Herrick claimed the Plaintiff was already arguing, loud and ranting when he came up, despite
that Michael Blanco had also stated that they watched a hockey game the Plaintiff had money on.
The Plaintiff exerted even more control over his manic episode initially, focusing intently on not letting the Silver
13 | Legacy have happened, what had previously happened at the Cal-Neva. But as the intrusion refused to absolve itself
and Michael Herrick became extremely rude, abrasive, condescending, sarcastic, and cynical, this only escalated the
14 | Plaintiff's mania by the time the Plaintiff reached level 4 of 5 in volume.

15 | But, again the Plaintiff was in control of himself, as the Plaintiff was able to compose himself enough, that while
relating his story to officers, so as not to alienate them from his side over his mannerisms, to the point that instead of
16 | being charged with trespassing under 8.10.010, the Plaintiff had convinced arresting officers that this was not lawful
given that a prior warning had not been given within the previous 6 months as associated with the statute, to the
17 | point that the Plaintiff was instead charged with a residential trespassing charge not amounting to burglary. And as
done with the Cal-Neva case, despite "excessive baggage," whatever that means, being the initiation for
18 | confrontation, it was again described by both Michael Blanco and Michael Herrick that the Plaintiff had acted
"belligerent, aggressive, and loud" which was why the Plaintiff ultimately was trespassed. Otherwise no justification
19 | for exclusion was available as a place of public accommodation can't just walk up and have someone arrested for no
reason.

20 | And again in the third situation that presented itself at the Eldorado property, despite the fact that the Plaintiff didn't
21 | even have a manic episode, until after several, in a lynch mob style of attack with an excessive 6-7 individuals,
attacked the Plaintiff who was trying to leave the property, which was what they wanted anyways, yet still described
22 | the Plaintiff as having been "belligerent, aggressive, and loud" as the reason why they did what they did.
Mania or Manic disorder is associated with Bipolar disorder and is characterized as *A distinct period of abnormally*
23 | *and persistently elevated, expansive, or irritable mood and abnormally and persistently goal-directed behavior or*
*energy, lasting at least 1 week and present most of the day, nearly every day (or any duration if hospitalization is*
24 | *necessary).* [4] *When determining whether an individual has Bipolar Manic Disorder what is associated is during the*
*period of mood disturbance and increased energy or activity, three (or more) of the following symptoms have*
25 |
26 |
27 | [4] Obtained from the Diagnostic and Statistical Manual of Mental Disorders 5th edition
https://www.ncbi.nlm.nih.gov/books/NBK519712/table/ch3.t7/
28 | AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND
RECOMMENDATIONS - 7

*persisted (four if the mood is only irritable) are present to a significant degree and represent a noticeable change from usual behavior:*

- *Inflated self-esteem or grandiosity*
- *Decreased need for sleep (e.g., feels rested after only 3 hours of sleep)*
- *More talkative than usual or **PRESSURE TO KEEP TALKING***
- *Flight of ideas or subjective experience that thoughts are racing*
- *Distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli), as reported or observed.*
- *Increase in goal-directed activity (either socially, at work or school, or sexually) or **psychomotor** agitation*
- *Excessive involvement in activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments).*

Psychomotor agitation is a symptom related to a wide range of mood disorders including, but not limited to, those with Bipolar disorder associated with both the manic and depressive components of Bipolar, which is where it is most prevalent. It is defined as *"movements that serve no purpose."* Examples include, but are not limited to pacing around the room, tapping your toes, flailing arm movement, or loud or rapid talking. People with psychomotor agitation can't stay still or remain calm. They use movement to release tension and anxiety. The most common signs of psychomotor agitation include: emotional distress, restlessness, tapping, hand-wringing, fast and/or loud talking and racing or crowded thoughts.[5]

Psychomotor agitation can be distressing for people who experience it and may also cause concern to others around them.[6] Someone experiencing psychomotor agitation, however, may display these behaviors in a way that seems: uncontrollable, without purpose, frantic, repetitive, and frustrated.[7]

This is where the "belligerent, aggressive, and loud" behavior claims come about. Due to the Plaintiffs reaction associated by the Plaintiffs disabilities not because of actual stated belligerent or aggressive conduct. This is why no specific examples of belligerent or aggressive behaviors were ever presented by the City of Reno's 4 witnesses, despite that the Plaintiff protested that his constitutional rights were being violated. Because as we are seeing they were. *The mood disturbance is sufficiently severe to cause marked impairment in social or occupational functioning or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.*[8] Psychomotor agitation has also been linked to PTSD.[9]

When determining if an individual meets the definition of disability it is again noted in Title III of the ADA (statute symbol) 36.105(2) *Rules of construction that (i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.*
*And that (ii) An individual may establish coverage under any one or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section. a)(1) Disability means, with respect to an individual:*
*(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;*
*(ii) A record of such an impairment;*
*(b)(1) Physical or mental impairment means:*
*(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, **EMOTIONAL or MENTAL ILLNESS**, and specific learning disability.*
*(2) Physical or mental impairment includes, but is not limited to, contagious and noncontagious diseases and*

---

[5] https://www.healthline.com/health/psychomotor-agitation#causes
[6] https://www.medicalnewstoday.com/articles/319711.php
[7] https://www.medicalnewstoday.com/articles/319711.php
[8] Obtained from the Diagnostic and Statistical Manual of Mental Disorders 5th edition
https://www.ncbi.nlm.nih.gov/books/NBK519712/table/ch3.t7/
[9] https://www.healthline.com/health/psychomotor-agitation#causes

conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, _emotional illness_, dyslexia and _other specific learning disabilities_, _Attention Deficit Hyperactivity Disorder_, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(c)(1) Major life activities include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, **_SLEEPING_**, walking, standing, sitting, reaching, lifting, bending, **_SPEAKING_**, breathing, learning, reading, _concentrating_, thinking, writing, **_COMMUNICATING_**, **_INTERACTING WITH OTHERS_**, and _working_.

Again the _Rules of construction_ state that (i) In determining whether an impairment substantially limits a major life activity, the term major shall not be interpreted strictly to create a demanding standard

(ii) Whether an activity is a major life activity is not determined by reference to whether it is of central importance to daily life.

(d) Substantially limits—(1) Rules of construction. The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

(iv) An impairment that is **_EPISODIC_** or in remission _is a disability if it would substantially limit a major life activity when active_. (interacting with others)

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(2) _Predictable assessments_. (i) The principles set forth in the rules of construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.

(ii) Applying these principles, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

(K) Major depressive disorder, **_BIPOLAR DISORDER_**, **_POST-TRAUMATIC STRESS DISORDER_**, traumatic brain injury, obsessive compulsive disorder, and schizophrenia each substantially limits brain function.

(3) Condition, manner, or duration.(i) At all times taking into account the principles set forth in the rules of construction, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of "disability," the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. _For example, someone with a learning disability may achieve a high level of academic_

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 9

1    *success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited*
     *to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read,*
2    *write, speak, or learn compared to most people in the general population.*
     *(iv) Given the rules of construction set forth in this section, it may often be unnecessary to conduct an analysis*
3    *involving most or all of the facts related to condition, manner, or duration. This is particularly true with respect to*
     *impairments such as those described in paragraph (d)(2)(iii) of this section, which by their inherent nature should*
4    *be easily found to impose a substantial limitation on a major life activity, and for which the individualized*
     *assessment should be particularly simple and straightforward.*
5    *(4) Mitigating measures include, but are not limited to:*
     *(i) Medication, medical supplies, **equipment**, appliances, low-vision devices (defined as devices that magnify,*
6    *enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics*
     *including limbs and devices, hearing aid(s) and ear implant(s) or other implantable hearing devices, mobility*
7    *devices, and oxygen therapy equipment and supplies.*
     T
8    he Plaintiff is opting to not claim the "regarded as" components of Title III of the ADA having sufficiently proven
     that the Plaintiff meets the first two prongs associated with the Plaintiffs bipolar manic disorder, and PTSD
9    primarily centralized upon the Plaintiffs symptom of psychomotor agitation.
     The Plaintiff additionally notes that the Plaintiff's insomnia is relevant as well. The specific calling out of an item,
10   blanket, used to accommodate sleeping, does absolutely qualify under the text of Title III of the ADA as outlined
     above. These disabilities again have attributed or are associated with, the Plaintiffs homelessness, and is thus why
11   the Plaintiff is correlating his defined status of being "chronically homeless" as being discriminated upon for being
     disabled. The enumerated components that pertain to the Plaintiffs disabilities in this case are underlined above in
12   the detailed text of Title III of the ADA with the **BOLD** signifying the primary components of the Plaintiffs
     argument.

13
     The Plaintiff will also be amending this complaint to include a (statute symbol) 1983 8th Amendment cruel and
14   unusual punishment claim against the City of Reno, the Cal-Neva, Silver Legacy/Eldorado, and the Reno Police
     Department for criminalization of the Plaintiff due to his status as being homeless. Similar to the main complaint,
15   but not within the parameters of Title III of the ADA, the Plaintiff is claiming that by focusing upon the Plaintiffs
     homelessness and criminalizing the Plaintiffs status they have criminalized the Plaintiff not because the Plaintiff was
16   causing problems pertaining to the Plaintiffs conduct, and is thus in violation of the 8th Amendment.
     The Plaintiff references Bell et. al. vs. The City of Boise No. 1:09-cv-540 (D. Idaho Aug. 6, 2015) 129 Harv. L. Rev.
17   1476 where the Department of Justice filed a Statement Of Interest (SOI) arguing that, *"where shelter space is*
     *unavailable, compliance with these ordinances has become impossible for the homeless, such that their*
18   *"enforcement . . . amounts to the criminalization of homelessness, in violation of the Eighth Amendment."*

19   In this ruling, the Department of Justice established that *"If the Court finds that it is impossible for homeless*
20   *individuals to secure shelter space on some nights because no beds are available, no shelter meets their disability*
     *needs, or they have exceeded the maximum stay limitations, then the Court should also find that enforcement of the*
21   *ordinances under those circumstances criminalizes the status of being homeless and violates the Eighth Amendment*
     *to the Constitution."*

22   To form this standing the Department of Justice relied upon Jones v. City of Los Angeles, 444 F.3d 1118 (9th Cir.
     2006) (vacated after settlement, 505 F.3d 1006 (9th Cir. 2007)), which held that *"enforcement of anti-camping*
23   *ordinances may violate the Eighth Amendment on nights where there is inadequate shelter space available for all of*
     *a city's homeless individuals."* The ruling of *Jones* turned on the notion that "sitting, lying, and sleeping are
24   "universal and unavoidable consequences of being human," "involuntary and inseparable from status," and that
     criminalizing such activity requires "[the impossibility of] human beings . . . remain[ing] in perpetual motion"
25   for compliance."

26
     The SOI included that, *The "Cruel and Unusual Punishments" Clause of the Eighth Amendment "imposes*
27   *substantive limits on what can be made criminal and punished as such."* Ingraham v. Wright, 430 U.S. 651, 667-68
     (1977). *Pursuant to that clause, the Supreme Court has held that laws that criminalize an individual's status, rather*
28

*than specific conduct, are unconstitutional.* Robinson v. California, 370 U.S. 660 (1962). *With the Robinson case the courts focused on a person being "continuously guilty."*

The courts further relied upon Powell v. Texas, 392 U.S. 514 (1968), *where the courts discussed "that the Eighth Amendment protects against criminalization of conduct that individuals are powerless to avoid."* While both Powell and Robinson center upon criminal acts such as drug use and public intoxication, the SOI also referenced  Pottinger v. City of Miami, 810 F. Supp. 1551, 1563 (S.D. Fla. 1992). Pottinger emphasized the "harmless" nature of the acts in question. The conduct at issue was "otherwise innocent." "Plaintiffs have not argued that the City should not be able to arrest them for public drunkenness or any type of conduct that might be harmful to themselves or to others." Because the city was attempting to punish innocent conduct that the plaintiffs were powerless to avoid, the ordinances violated the Eighth Amendment."

The Reno/Sparks Gospel Mission has a  Free, yearlong 100-**bed** substance abuse recovery program (82 men, 18 women); 190-**bed**emergency shelter for men; 45-**bed** emergency shelter for women;[10] Does the court honestly believe there are less than 190 homeless adult males, as the 82 that are part of a substance abuse program the Plaintiff doesn't qualify for he doesn't have substance abuse issues, on any given night in the Reno/Sparks area? Thus if there is not enough shelter space available for ALL the Homeless, *Jones,* then to prosecute an individual for solely having property and not because of the conduct of an individual, falls under criminalizing status, and is in violation of the 8th Amendment.

Further, as mentioned earlier the Reno/Sparks Gospel Mission doesn't accommodate the Plaintiffs needs not only pertaining to the Plaintiffs disabilities, the Plaintiffs manic reaction cause heated negative interactions with staff and other homeless and the Plaintiffs insomnia as the Plaintiff seems to sleep best from 4 a.m. to 12 p.m., and having a safe environment that is not thriving upon theft drugs and sexual misconduct, i.e. shitting in showers, on toilets, pissing not in toilets, obnoxious belligerent drunks, people sucking each other off in bathrooms with no stalls, no privacy/personal space, toxic environment, etc. etc.

When considering the components of "powerless to avoid," consideration shouldn't been given to if the Plaintiff had power to avoid the property, but rather from the perspective of does the Plaintiff have the power to avoid bringing his property into any place of public accommodation. Given that the Plaintiff has no place to store his property safely, and the establishment doesn't provide a baggage claim room, for example as Grand Sierra Resort (GSR) accommodates, in order to get food, use a bathroom, or even relax, the Plaintiff would be "continuously guilty" for "innocent acts."

Pushing this further, it would amount to discrimination, to take consideration from the perspective that one's right to entertainment, relaxation, and community involvement are not things a person has to have, in the context of "universal and unavoidable consequences of being human," as this could be construed as violating a right through association of ones right to pursue happiness, a benefit to which entertainment is, along with equitable treatment, and access to facilities available to all others.

Additionally, as mentioned in *Jones,* a human can't just constantly grind away with no break, or in the courts words being in "perpetual motion," as this is over demanding as homeless are forced to live their lives in full view of public scrutiny, which thus includes times of relaxation and recovery. As well as the fact that the further homeless get from socialized norms, i.e. community interaction and involvement, the more likely these individuals will remain homeless long term. People's situations improve generally when those of the community assist in some way that helps remedy or alleviate the problems, i.e employment, housing, support networks, etc. etc.

Although these statutes pertain primarily to camping ordinances; sleeping, sitting, or lying in public, and in these cases the Plaintiff was charged with trespassing, which is an actual crime of conduct generally, the original reason to

_____

[10] https://www.guidestar.org/profile/88-6005643

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 11

incite was based off the Plaintiffs status as being homeless and not any misconduct actual conducted by the Plaintiff. Which is why the City of Reno presented a case where they tried to describe the Plaintiff as being "belligerent, aggressive and loud," to support their intrusion. This is further emphasized by the relevance of the discrimination of policies not being evenly enforced and through the 14th Amendment, as noted:

*"The fact that the "state action" category is not limited to situations in which state law affirmatively authorizes discriminatory action was made clearer in* Yick Wo v. Hopkins, 118 U.S. 356 (1886)⁻ˣˣˣ *in which the Court found unconstitutional state action in the discriminatory administration of an ordinance that was fair and nondiscriminatory on its face."*

Which brings us to the obligation of associating as "state actor" under the "state-action doctrine," a public entity. As cited by Magistrate Judge Cobb, under the Supreme Court precedent:
[A] *private entity can qualify as a state actor in few limited circumstances including (iii) when the government acts jointly with the private entity, see e.g.,* Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-942, 102 S.Ct 2744, 73 L.Ed.2d 482 (1982)

The Plaintiff additionally cites from the Scope and Application section of the 14th Amendment that
"But the difficulty for the Court has been when the conduct complained of is not so clearly the action of a state... What if a private party engages in discrimination while in a special relationship with governmental authority? "The vital requirement is State responsibility," Justice Frankfurter once wrote, "that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme" to deny protected rights."

The Plaintiff points to the unlawful use of (statute symbol) 8.10.010 trespassing by the Reno Police Department , in which through the frivolous complaint made by a private entity, enforced by the Reno Police Department, and later through prosecution of the Plaintiff by the City of Reno, which outside of the scope of provisions associated with the (statute symbol) 8.10.010, that if the property was open to the public at the time the warning must have been given within the previous 6 months that, through use of a government agency to enforce exclusion, the private entity is recognized under authority of being a state actor.  In simpler terms because the casinos used state agencies to violate the Plaintiffs rights they have in fact acted jointly. This can be emphasized with:

"Not even the fact that the actions of the state agents are illegal under state law makes the action attributable to the state for purposes of the Fourteenth Amendment. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."⁻ˣˣ When the denial of equal protection is not commanded by law or by administrative regulation but is nonetheless accomplished through police enforcement of "custom"⁻ˣˣˣ or through hortatory admonitions by public officials to private parties to act in a discriminatory manner,⁻ˣˣˣ the action is state action. In addition, when a state clothes a private party with official authority, that private party may not engage in conduct forbidden the state."ˡˣˣⁱ
And expounding further " Beyond this are cases where a private individual discriminates, and the question is whether a state has encouraged the effort or has impermissibly aided it.⁻ˣˣ Of notable importance and a subject of controversy since it was decided is Shelley v. Kraemer 334 U.S. 1 (1948)...⁻ˣˣ Establishing that the precedents were to the effect that judicial action of state courts was state action..."

The Plaintiff notes that it is police enforcement by "custom," not lawful policy, when officers arrest citizens for trespassing at a place of public accommodation when, the accursed has not been previously Trespassed within a 6 month time frame as provided, or the individual has caused good reason to exclude i.e. being the cause of (not the private entity being the cause of, as in this case) a disturbance to the normal operations of the establishment which includes up to 6 months or even longer ban, once having gone through the proper judicial process. Generally during this process should reason be provided this trespassing time starts upon initial filing of charges for conduct that is impermissible. This in no way prevents businesses of public accommodations from excluding those who thus cause issues, through criminal misconduct.

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 12

The Plaintiff would even assert that by providing security the authority to handcuff and detain the Plaintiff, in a segregated room, under these statutes, such as is relevant with the Silver Legacy situation and the Eldorado situation, that "The state has clothed a private party with official authority, and that party may not engage in conduct forbidden by the state." Unlawful seizure, restrictions on free speech, cruel and unusual punishment, unequal protection of the law, vague and overbroad policies, excessive force, malicious prosecution, and discrimination, are all conduct forbidden by the state.

The text provided under the Scope and Application section of the 14th Amendment, can go on and on with relevant instances which would show liability of the private entities in this case to which the Plaintiff feels with this final declaration the Plaintiff will have provided enough to substantiate his claims against the Cal-Neva and Silver Legacy/Eldorado as being associated as state actors:

"*The Court subsequently made clear that governmental involvement with private persons or private corporations is not the critical factor in determining the existence of "state action." Rather, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."²³⁰ Or, to quote Judge Friendly, who first enunciated the test this way, the "essential point" is "that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of the complaint.*"

Which is exactly what the Plaintiff is saying. If it wasn't for the unlawful enforcement of 8.10.010 by The Reno Police Department which permitted the unlawful discriminatory exclusions of the Plaintiff, by ignoring the clearly outlined requirements pertaining to places of public accommodation, the private entities would have had no grounds for exclusion. Again if The City of Reno had respected the provisions put in place, likely to protect citizens rights to places of public accommodation, then the Plaintiff would never have been wrongfully convicted in a Kangaroo Court and told at sentencing that "If the Plaintiff is told to do something, he just needs to do what he is told," which violates the Plaintiffs rights, liberties, and procedure as this is absolutely not "established law."
The Plaintiff is including as the central inflictors of claimed discriminative exclusion of a place of public accommodation, the City of Reno/Reno Police Department, again citing common law principles provided by Magistrate Judge Cobb with Monell v. Dep't of Soc. Serves., 436 U.S. 658, 690-05 (1978); Horton v. City of Santa Maria, 915 F3.d 592, 602-03 (9th Cor. 2019) ("[M]unicipalities may be liable under (statute symbol) 1983 for constitutional injuries to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker.").

The Plaintiff points to both (2) a pervasive practice or custom and (3) a failure to train supervise, or discipline as being applicable. The pervasive practice of enforcing trespass cases on citizens solely because a place of public accommodation, primarily casino's but not limited to, have requested it, without providing basis of an actual, not perceived, criminal misconduct that can be proven, be associated with the trespassing a citizen, is one example. Another, would be not a failure to properly train officers, on public accommodation law, to which officers in this area have no clue what that is, nor how to understand and enforce the provisions associated with 8.10.010, along with that officers have no one to resolve their confusions pertaining to a law, encompasses this case.

Examples would include, Officer Borba telling the Plaintiff who was contesting the unlawful arrest, "Good luck changing the law on that one," yet clearly the Plaintiff has not had to change any laws at all for the Plaintiff to be right. Why is it that a homeless man understands the law better then a paid law enforcement professional? Another example is how officers in the Silver Legacy case didn't know what to charge the Plaintiff with after having been rationally convinced that 8.10.010 was not applicable, through the Plaintiffs protests. Despite this fact they stood by their pervasive custom and just called it something else, not even taking into account the new statutes provisions, and still arrested the Plaintiff. The fact that in situations like this officers don't have a City, District, or US Attorney to consult with on the technical legalities is pathetic. We live in the age of information where enforcing laws wrongly because they didn't know, is not an excuse. In other words the ignorance of the law doctrine our courts so love to proclaim is applicable both ways. Should there have been available an actual attorney, especially one that could take up the case later should it be determined necessary, to discuss relevant legal issues, then it is likely these claims could have been avoided. Instead the City, the Reno Police Department, and several places of public

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 13

accommodations have attempted to exploit the Plaintiff, who is proving his non ignorance of the law, by seeking redress of grievance for the discrimination and deprivation of the unalienable constitutional rights of the Plaintiff.

The Plaintiff will be Amending the Complaint as follows:
**AMENDED COMPLAINT**

NAMED PARTIES IN FULL SUIT:
1. The City of Reno (official capacity)
2. Reno Police Department (official capacity)
3. The Cal-Neva (official capacity)
4. Reno Police Officer Borba (individual and official capacity) arresting
5. The Silver Legacy/Eldorado Hotel and Casino (official capacity)
6. Reno Police Officer Bohr (individual and official capacity) arressting
7. Reno Police Officer (identify) (individual and official capacity) assisting SL case
8. Reno Police Officer (identify) assisting SL case
9. Reno Police Officer (identify) assisting SL case
10. Reno Police Sergeant (identify) (individual and official capacity)
11. Reno City Attorney Angie Gianoli  (individual and official capacity)
12. Reno Municipal Court Judge Dorothy Nash-Holmes (official capacity)
13. City of Reno Municipal Court

**COUNT 1**
NAMED DEFENDANTS:
1. The City of Reno
2. Reno Police Department
3. Reno Police Officer Borba
4. The Cal-Neva

The Plaintiff is claiming that the following deprivations occurred:

1) Title III of the ADA, public accommodations discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's chronic homelessness, through exclusion based upon arbitrary and unposted policies, focused upon the Plaintiff's chronic homelessness and not the Plaintiffs conduct.

2) Title III of the ADA, public accommodation discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's Manic Disorder connected to the Plaintiffs Bipolar Disorder, predicated on the psychomotor agitation components of the Plaintiffs Manic Disorder, initiated by named parties on the pretext of arbitrary, overbroad, and unposted policies.

3) (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from Cruel and Unusual Punishment, a violation of the 8th Amendment of the Constitution, in that, said parties criminalized the Plaintiffs status of being homeless/chronically homeless, through unlawful exclusion of a place of public accommodation, disregarding the scopes of RMC 8.10.010, in that if a property was open to the public at the time a previous warning must have been given within the previous 6 months, and not unlawful conduct presented by the Plaintiff.

4) (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from unlawful seizure, a violation of the 4th Amendment of the Constitution, in that, said parties unlawfully excluded the Plaintiff over policies arbitrarily enforced resulting in discrimination of the Plaintiff, through disregard of the scopes of RMC 8.10.010, in that if the property was open to the public at the time the warning must have been given within the previous 6 months.

5) (Section symbol) 1983 action for deprivation of the Plaintiffs right to free speech and expression, a violation of the 1st Amendment of the Constitution, in that, through solely using the fact that the Plaintiff protested his rights were being violated, and the way in which the Plaintiff expressed himself, the named parties have punished the Plaintiff for speaking up against their intrusions, not because of specific conduct.

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 14

6)  (Section symbol) 1983 action for deprivation of the Plaintiffs right to Equal Protection Under the Law, a violation to the 14th Amendment of the Constitution, in that named parties arbitrarily enforced unposted policies discriminatively, and refused to provide the same protections as any other citizen, by excluding the Plaintiff based upon his status and not conduct of.

**COUNT 2**
NAMED DEFENDANTS:
1. The City of Reno
2. Reno Police Department
3. Reno Police Officer Bohr
4. The Silver Legacy
The Plaintiff is claiming that the following deprivations occurred:

1.  Title III of the ADA, public accommodations discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's chronic homelessness, through exclusion based upon arbitrary, unposted, vague and overbroad policies, focused upon the Plaintiff's chronic homelessness and not the Plaintiffs conduct.

2.  Title III of the ADA, public accommodation discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's Manic Disorder connected to the Plaintiffs Bipolar Disorder, predicated on the psychomotor agitation components of the Plaintiffs Manic Disorder, initiated by named parties on the pretext of arbitrary, overbroad, and unposted policies.

3.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from Cruel and Unusual Punishment, a violation of the 8th Amendment of the Constitution, in that, said parties criminalized the Plaintiffs status of being homeless/chronically homeless, through unlawful exclusion of a place of public accommodation, disregarding the scopes of RMC 8.10.010, in that if a property was open to the public at the time a previous warning must have been given within the previous 6 months, and not unlawful conduct presented by the Plaintiff.

4.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from unlawful seizure, a violation of the 4th Amendment of the Constitution, in that, said parties unlawfully excluded the Plaintiff over policies arbitrarily enforced resulting in discrimination of the Plaintiff, through disregard of the scopes of RMC 8.10.010, in that if the property was open to the public at the time the warning must have been given within the previous 6 months.

5.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to free speech and expression, a violation of the 1st Amendment of the Constitution, in that, through solely using the fact that the Plaintiff protested his rights were being violated, and the way in which the Plaintiff expressed himself, the named parties have punished the Plaintiff for speaking up against their intrusions, not because of specific conduct.

6.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to Equal Protection Under the Law, a violation of the 14th Amendment of the Constitution, in that named parties arbitrarily enforced unposted policies discriminatively, and refused to provide the same protections as any other citizen, by excluding the Plaintiff based upon his status and not conduct of.

**COUNT 3**
NAMED DEFENDANTS:
1.  The City of Reno
2.  Reno Police Department
3.  Eldorado Hotel Casino
4.  Reno Police Sergeant John Doe #1

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 15

The Plaintiff is claiming that the following deprivations occurred:

1.  Title III of the ADA, public accommodations discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's chronic homelessness, through exclusion based upon arbitrary, unposted, vague and overbroad policies, focused upon the Plaintiff's chronic homelessness and not the Plaintiffs conduct.

2.  Title III of the ADA, public accommodation discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's Manic Disorder connected to the Plaintiffs Bipolar Disorder, predicated on the psychomotor agitation components of the Plaintiffs Manic Disorder, initiated by named parties on the pretext of arbitrary, overbroad, and unposted policies.

3.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from Cruel and Unusual Punishment, a violation of the 8th Amendment of the Constitution, in that, said parties criminalized the Plaintiffs status of being homeless/chronically homeless, through unlawful exclusion of a place of public accommodation, disregarding the scopes of RMC 8.10.010, in that if a property was open to the public at the time a previous warning must have been given within the previous 6 months, and not unlawful conduct presented by the Plaintiff.

4.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from unlawful seizure, a violation of the 4th Amendment of the Constitution, in that, said parties unlawfully excluded the Plaintiff over policies arbitrarily enforced resulting in discrimination of the Plaintiff, through disregard of the scopes of RMC 8.10.010, in that if the property was open to the public at the time the warning must have been given within the previous 6 months.

5.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to free speech and expression, a violation of the 1st Amendment of the Constitution, in that, through solely using the fact that the Plaintiff protested his rights were being violated, and the way in which the Plaintiff expressed himself, the named parties have punished the Plaintiff for speaking up against their intrusions, not because of specific conduct.

6.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to Equal Protection Under the Law, a violation to the 14th Amendment of the Constitution, in that named parties arbitrarily enforced unposted policies discriminatively, and refused to provide the same protections as any other citizen, by excluding the Plaintiff based upon his status and not conduct of.

## COUNT 4

NAMED DEFENDANTS:
1.  The City of Reno
2.  City of Reno Municipal Court
3.  City of Reno Municipal Court Judge Dorothy Nash Holmes
4.  City of Reno Attorney Angie Gianoli

The Plaintiff is claiming that the following deprivations occurred:

1.  Title III of the ADA, public accommodation discrimination violation, through depriving the Plaintiff of his rights, the benefits of, equitable treatment, and access to facilities available to all others, based upon the Plaintiff's Manic Disorder connected to the Plaintiffs Bipolar Disorder, predicated on the psychomotor agitation components of the Plaintiffs Manic Disorder, initiated by named parties on the pretext of arbitrary, overbroad, and unposted policies.

2.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to be free from Cruel and Unusual Punishment, a violation of the 8th Amendment of the Constitution, in that, said parties criminalized the

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 16

Plaintiffs status of being homeless/chronically homeless, through unlawful exclusion of a place of public accommodation, disregarding the scopes of RMC 8.10.010, in that if a property was open to the public at the time a previous warning must have been given within the previous 6 months, and not unlawful conduct presented by the Plaintiff.

3.  (Section symbol) 1983 action for deprivation of the Plaintiffs right to free speech and expression, a violation of the 1st Amendment of the Constitution, in that, through solely using the fact that the Plaintiff protested his rights were being violated, and the way in which the Plaintiff expressed himself, the named parties have punished the Plaintiff for speaking up against their intrusions, not because of specific conduct.

4.  (Section symbol) 1983 action for deprivation of the Plaintiffs right for Equal Protection Under the Law, a violation to the 14th Amendment of the Constitution, in that named parties arbitrarily enforced unposted policies discriminatively, and refused to provide the same protections as any other citizen, by excluding the Plaintiff based upon his status and not conduct of.

## OBJECTIONS TO MAGISTRATE JUDGES REPORT AND RECOMMENDATIONS

Due to time constraints, the Plaintiff has been forced to file the above information to ensure a timely filed Amendment to the complaint, to ensure that the complaint does not only proceed on the mentioned officers in the report. But, the Plaintiff has not been allowed to discuss his objections to Judges who push their own agenda must be held accountable, which is an aspect the Plaintiff if must would like to take for a Supreme Court or Initiative Petition challenge as it is ludicrous and illogical to think that those who are tasked with holding others should not be held accountable when the conduct a Kangaroo Court, which the Plaintiff hoped to expound upon showing exactly that, and a court where judges clearly acknowledge the Law but don't abide by it. This leads to arbitrary enforcement of laws! With all respect to The Honorable Judge Cobb, but the rulings provided by him are audacious as the clearly permit corrupt court proceedings the stray away from established precedents, it permits perjury and soils the integrity of the justice system.

The Plaintiff would have like to cover how this violates the 14th Amendment Equal Protection Clause as we all must be held accountable, 1st Amendment right for redress of grievance as this extends to all government positions not special protections in place that allows for deprivation of rights of citizens on an arbitrary basis, and other legal contradictions. The Plaintiff notes that he has been arduously studying the Law over the last 9 years and the most offensive thing he tells others and has come to find, is the Law is filled with nothing but contradictions and hypocrisy. This must change in the best interest of Justice as this makes no sense!

The Plaintiff notes Edwards v. Valdez, 789 F. 2d 1477, 1481 (10th Cir 1986) *It is well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls.*

The language of the 1st Amendment clearly address that we as citizens have the right to redress of grievance and this does not provide immunity to Judges, prosecutors, congressman, senators, other law makers, or even the President from being held accountable as this beyond a doubt provides an irrational result. Ignoring the Law. As judge Holmes blatantly did. Comments in a verdict stating a 60 page brief that discussed the Plaintiffs innocence which was described as "a detailed factual argument citing copious common law principles" which clearly states legal agreement with the Plaintiff, yet a guilty verdict with no legal support followed is a prime example.

While the Plaintiff notes agreement with the courts that under the Standard discussed initially under screening that: *"(iii) seeks monetary relief against a defendant who is immune from such relief."* 28 U.S.C.(e)(2)(B)

*The Plaintiff notes that pertaining to Judge Dorothy Nash Holmes and City of Reno Attorney Angie Gianoli, the Plaintiff is not seeking monetary reimbursement for their violations. Rather the Plaintiff wants removal of Judge Dorothy Nash Holmes from legal judiciary duties from hence forth in all jurisdictions. Should it be proven that a Kangaroo Court was conducted where she blatantly ignored established law she can not be trusted to follow the law. Her integrity is blown. Just like officers who are proven to be liars through perjury are no longer trustworthy, judges who push their own agenda and blatantly ignore established law are just the same. The Plaintiff also as*

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 17

redress of grievances would like to acquire the judges Robes, as a form of trophy to establish the Plaintiffs clear knowledge of the law. The Plaintiff has come to a desire to fill his wall of "legal education supported knowledge," with Badges and Robes from unlawful officers and Judges instead of a paper degree from some accredited university. While in this case only Judge Dorothy Nash Holmes does the Plaintiff feel needs to have such extensive measures taken, the others involved need to be reprimanded for their conduct and involvement including City Attorney Angie Gianoli and the officers involved. The blunt of the punitive and injunctive damages are being sought from the City of Reno, the Reno Police Department, and the Casinos Cal-Neva and Silver Legacy/Eldorado for their violations. And finally the Plaintiff wants policy adjustment to follow established laws. For corporations not to be allowed to abuse the judiciary system with tax payer legal assistance over frivolous issues. If corporations are people then they need to go through the same process we the people must in order to keep unwanted people away. That's what stay away proceedings are for.

The Plaintiff would like to have more of an opportunity to expound on what he has discussed here but in order to keep the proceedings running smoothly the Plaintiff has had to file this not completed to the Plaintiffs desires. The Plaintiff has been overwhelmed with other court dates, and the arduous process this takes while trying to maintain. The Plaintiff recently came into some income that is likely to alter the Plaintiffs IFP status. The Plaintiff once the payment has been finalized will provide payment and proof of new financial and housing information. The Plaintiff would like to note that it is taxing to respondents when the courts can't make a special priority to motions for extensions or a continuance, such as the Plaintiff pointlessly seems to have filed as it has not been addressed in time.

The Plaintiff provides this under Penalty of Perjury, that the information provided is true and accurate to the best of the Plaintiffs knowledge.

8-16-19
_____
Dated

CMJMJR
_____
Signature

AMENDED COMPLAINT ANDPLAINTIFFS OBJECTIONS TO MAGISTRATE JUDGES REPORTAND RECOMMENDATIONS - 18